UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Richmond Division

ZACHARY ALLEN MARTIN,

        Plaintiff,

                                CIVIL ACTION NO.   3:11cv654

Q&A ENTERPRISES, INC., t/a
GLOBAL SELECT AUTO,

and

CRESCENT-VIRGINIA LOAN PRODUCTION, INC.,
t/a CRESCENT BANK AND TRUST,
        SERVE:     National Corporate Research LTD
                     250 Browns Hill Ct.
                     Midlothian, Virginia   23114

and

CONSUMER PORTFOLIO SERVICES, INC.,
        SERVE:     CT Corporation System
                     4701 Cox Road, Suite 301
                     Glen Allen, Virginia   23060-6802

and

J.P. MORGAN CHASE BANK, N.A., t/a
CHASE CUSTOM FINANCE,
        SERVE:     CT Corporation System
                     4701 Cox Road, Suite 301
                     Glen Allen, Virginia   23060-6802

                     Defendants.

## FIRST AMENDED COMPLAINT  *(Corrected)*

### INTRODUCTION

COMES NOW the Plaintiff, Zachary Allen Martin, (hereafter the "Plaintiff") by counsel, and for his complaint against the Defendants, alleges as follows:

1.      This is a case arising from a common sales tactic in the retail automobile sales industry called "a yo-yo sale" or "spot delivery."   Using this tactic, the dealer sells an automobile to the consumer "on the spot."   The consumer signs all paperwork, often pays a down payment and/or provides a trade in, receives a certificate of registration, temporary or transferred tags, gets insurance coverage for the vehicle, and is provided possession of the automobile.   All purchase and loan documents are signed by the consumer.   The consumer leaves the dealership believing he or she owns the automobile since he is told his loan was approved.   The sale is financed by the dealer (as the creditor) on a Retail Installment Sales Contract (RISC).   As in the present case, only after the sale is done does the dealer then attempt to sell or assign this installment credit contract (the RISC) to a third party finance company. When the dealer for whatever reason decides not to go through with the deal, or the third party finance companies it "shopped" the loan to is unwilling to purchase the RISC, the dealer attempts to "undo" or cancel the sale, and repossesses or yanks it back from the buyer like a yo-yo.

Sometimes, as in the present case, the dealer will submit a credit application on certain terms to third party lenders, that approve the loan on those terms, but the dealer does not advise the consumer of the terms actually accepted, and convinces the buyer to agree to terms that are higher or "worse" for the consumer by claiming that the terms presented are the only terms that were approved, terms which create a higher profit for the dealer. The consumer never learns that his credit request for a loan on the lower terms was approved because the dealer never advises that the

2

lower terms were approved, and the third party lender never provides the buyer notice of the approval, as required by the Equal Credit Opportunity Act. (ECOA).

Sometimes, as in the present case, the dealer will also attempt to get the customer to sign a second batch of purchase documents, requiring more money, since it knows the customer is emotionally committed to the car and is vulnerable to the threat that the deal will be cancelled if he does not sign the new, more expensive contract. However, if the sale is cancelled, neither the dealer nor the finance company send the consumer any written notice of adverse action, and sometimes, as in this case, the dealer confiscates the down payment, even though it has cancelled the purchase contract and repossessed the vehicle.

These shady practices violate the ECOA, the Truth In Lending Act ("TILA"), and the Federal Fair Credit Reporting Act ("FCRA").   They also violate the Virginia Consumer Protection Act ("VCPA"), the Virginia Motor Vehicle Code, and often violate the Uniform Commercial Code since the repossession occurs before any default and no notice of disposition of the repossessed vehicle is provided.   Furthermore, these tactics of fraudulently inducing the signing of the contract and then failing to abide by the contract and canceling the sale, constitutes fraud and breach the contract.

## JURISDICTION

2.      This lawsuit is being brought pursuant to the Fair Credit Reporting Act, 15 U.S.C. §1681 et seq and the Equal Credit Opportunity Act, 15 U.S.C. §§ 1691 et seq, which present federal questions and as such jurisdiction arises under 28 U.S.C. §§1331, 1337.

3.      This court may exercise supplemental jurisdiction over the related state law claims arising out of the same nucleus of operative facts which give rise to the Federal law claims under

28 U.S.C. §1367.

4.      Venue is proper in this court since most of the defendants, Crescent-Virginia Loan

Production, Inc., t/a Crescent Bank and Trust, Consumer Portfolio Services, Inc., and J.P. Morgan

Chase Bank, N.A., t/a Chase Custom Finance, have their registered agent located within the

Richmond Division of the Eastern District of Virginia, and the Plaintiff chooses to bring this

lawsuit here.

## PARTIES

5.      Plaintiff is a consumer as governed by the ECOA, FCRA, Virginia Code §8.9-

25, and Virginia Code §59.1-196 et seq. of the VCPA.

6.      Defendant, Q&A Enterprises, Inc., t/a Global Select Auto, (hereinafter "Global"),

is a Virginia corporation doing business as a retail automobile dealer. At all times relevant

hereto it was a "creditor" as defined and governed by the ECOA (15 U.S.C. §1691a(e)) and

FCRA (15 U.S.C. §1681m).

7.      At all times relevant hereto Global was a "supplier" as governed and defined by the

VCPA (Virginia Code § 59.1-198) and was a motor vehicle dealer as governed by Virginia Code

Section 46.2-1500, et seq.   At all times relevant hereto it was a "creditor" as governed and defined

by ECOA, 15 U.S.C. §1691a(e) and FCRA (15 U.S.C. §1681m).

8.      Defendant, Crescent-Virginia Loan Production, Inc., t/a Crescent Bank and Trust,

(" Crescent Bank") is a Corporation doing business as a financial institution and doing significant

business in the Richmond Division, in the Eastern District of Virginia, where it maintains its

registered agent.   At all times relevant hereto it was a "creditor" as governed and defined by

ECOA, 15 U.S.C. §1691a (e) and FCRA (15 U.S.C. §1681m).

4

9.       Defendant, Consumer Portfolio Services, Inc. ("CPS"), is a Corporation doing business as a   financial institution and doing significant business in the Richmond Division, in the Eastern District of Virginia, where it maintains its registered agent.   At all times relevant hereto it was a "creditor" as governed and defined by ECOA, 15 U.S.C. §1691a (e) and FCRA (15 U.S.C. §1681m).

10.      Defendant, J. P. Morgan Chase Bank, N.A., t/a Chase Custom Finance ("Chase Finance"), is a foreign corporation doing business as a financial institution in Virginia which does significant business in the Richmond Division, in the Eastern District of Virginia.   At all times relevant hereto it was a "creditor" as governed and defined by ECOA, 15 U.S.C. §1691a (e) and FCRA (15 U.S.C. §1681m).

## FACTS

11.      On or about April 20, 2011 Plaintiff went online to Global to purchase a vehicle he had seen advertised by Global on Craig's List for $18,900.00, a 2004 Porsche Cayenne, VIN: WP1AB29P04LA61572 (the "vehicle").   He also filled out a credit application online providing certain personal information to see if he could qualify for a loan for the vehicle.

12.      Global made a credit inquiry into Plaintiff's credit on April 20, 2011 and soon thereafter "Alex," a manager for Global (last name unknown), called and advised that Plaintiff qualified for a loan in order to buy the Porsche and to come to the dealership to work out the details.

13.      Dealer Track is a company that instantly and simultaneously communicates to various third party lenders credit applications car dealers submit for customers seeking financing.

14.      In order to find a third party lender it hoped to assign the loan it intended to give the Plaintiff for the vehicle purchase, on or about April 21, 2011, it is believed through Dealer Track,

5

Defendant Global submitted a "completed application" for an extension of credit to Crescent Bank, CPS , and Chase Finance for the Plaintiff's purchase of the vehicle, an application that was in accordance with the procedures used by the creditor for the type of credit requested, and provided information necessary for the Defendants to obtain access to Plaintiff's credit report information, the credit score of the Plaintiff, and it is believed it provided certain biographical information, and income, expenses, etc.

15.     Chase Finance approved the approved the loan application of the Plaintiff for $19,118.00, with an Annual Percentage Rate of 9.75% up to 12.25%, on a 60 month loan, with certain stipulations. See **Exhibit 1 ("The Approval")**.   The terms of this approval were different "better" for the Plaintiff than those presented to the Plaintiff by Global in the Retail Installment Sales Contract #1 attached hereto as Exhibit 3..

16.     CPS also approved the completed loan application request of the Plaintiff submitted by Global.

17.     CPS, and Chase Finance never provided any notice of approval of any request for credit either explicitly of implicitly, to the Plaintiff.

18.     The Defendants did not approve the Plaintiff's request for credit on the terms noted in the RISC (Exhibit 3) after making credit inquiries into Plaintiff's credit report on April 21, 2011, but never provided Plaintiff written notice of this adverse action.

19.     On April 23, 2011, Plaintiff and two friends went down to the dealership and upon arrival met his salesman, "Bola" (last name unknown), (hereinafter "Bola") and the manager, "Alex." During negotiations "Bola" advised Plaintiff that the vehicle had not been in an accident or previously painted. They also negotiated a purchase price with Alex if Plaintiff made a $5000.00 down payment they would reduce the price to $18,500.00, and he advised that his loan

had been approved.

20.     On April 23, 2011 Plaintiff paid $4,000.00 in cash, and provided a $1,000.00 check to Global which advised that it would return the check to him when he brought in $1.000.00 in cash, since Alex advised that Global did not accept checks.

21.     On April 23, 2011, after waiting three or more hours to go through this sale process, being rushed through the signing of the paperwork, relying on the representations that the vehicle had no accident or re-painting history, that the $18,500.00 purchase price had increased to $22,498.88 due to certain fees that were included, that he qualified for a loan, that the terms of the loan were the best that could be found for the plaintiff, and that it would do the DMV paperwork to transfer title into his name, Plaintiff agreed to purchase of the vehicle (the "Sale").   All conditions of the Sale were fulfilled and satisfied by the Plaintiff.   Plaintiff made a $4,000.00 down payment and provided the $1,000.00 check, expecting to bring in the cash at a later date, at which time his check was to be returned. See Buyer's Order attached **Exhibit 2**.

22.     The Buyer's Order provided to the Plaintiff on the date of sale does <u>not</u> contain the notice required by Virginia Code § 46.2-1530 which states in pertinent part:

A buyer's order shall include:…

12.    If the dealer delivers to the customer a vehicle purchased by the customer on or after July 1, 2010, that is conditional on dealer-arranged financing, the following notice, printed in bold type no less than ten point: 'IF YOU ARE FINANCING THIS VEHICLE, PLEASE READ THIS NOTICE: YOU ARE PROPOSING TO ENTER INTO A RETAIL INSTALLMENT SALES CONTRACT WITH THE DEALER. PART OF YOUR CONTRACT INVOLVES FINANCING THE PURCHASE OF YOUR VEHICLE. IF YOU ARE FINANCING THIS VEHICLE AND THE DEALER INTENDS TO TRANSFER YOUR FINANCING TO A FINANCE PROVIDER SUCH AS A BANK, CREDIT UNION OR OTHER LENDER, YOUR VEHICLE PURCHASE DEPENDS ON THE FINANCE PROVIDER'S APPROVAL OF YOUR PROPOSED RETAIL INSTALLMENT SALES CONTRACT. IF YOUR RETAIL INSTALLMENT SALES CONTRACT IS APPROVED WITHOUT A CHANGE THAT INCREASES THE COST OR

7

RISK TO YOU OR THE DEALER, YOUR PURCHASE CANNOT BE CANCELLED. IF YOUR RETAIL INSTALLMENT SALES CONTRACT IS NOT APPROVED, THE DEALER WILL NOTIFY YOU VERBALLY OR IN WRITING. YOU CAN THEN DECIDE TO PAY FOR THE VEHICLE IN SOME OTHER WAY OR YOU OR THE DEALER CAN CANCEL YOUR PURCHASE. IF THE SALE IS CANCELLED, YOU NEED TO RETURN THE VEHICLE TO THE DEALER WITHIN 24 HOURS OF VERBAL OR WRITTEN NOTICE IN THE SAME CONDITION IT WAS GIVEN TO YOU, EXCEPT FOR NORMAL WEAR AND TEAR. ANY DOWN PAYMENT OR TRADE-IN YOU GAVE THE DEALER WILL BE RETURNED TO YOU. IF YOU DO NOT RETURN THE VEHICLE WITHIN 24 HOURS OF VERBAL OR WRITTEN NOTICE OF CANCELLATION, THE DEALER MAY LOCATE THE VEHICLE AND TAKE IT BACK WITHOUT FURTHER NOTICE TO YOU AS LONG AS THE DEALER FOLLOWS THE LAW AND DOES NOT CAUSE A BREACH OF THE PEACE WHEN TAKING THE VEHICLE BACK. IF THE DEALER DOES NOT RETURN YOUR DOWN PAYMENT AND ANY TRADE-IN WHEN THE DEALER GETS THE VEHICLE BACK IN THE SAME CONDITION IT WAS GIVEN TO YOU, EXCEPT FOR NORMAL WEAR AND TEAR, THE DEALER MAY BE LIABLE TO YOU UNDER THE VIRGINIA CONSUMER PROTECTION ACT.' "

23.    On April 23, 2011, Global accepted Plaintiff's completed application for credit and upon such application, informed Plaintiff that he was approved for the financing, that the terms of the RISC #1, which designates Global as the Creditor- Seller, were the best that it could find, that he would receive   the payment book for the car loan in the mail, and that to complete the deal, all he needed to do was sign the paperwork.

24.    After Plaintiff completed the paperwork and was told by Global that his proposed loan for the vehicle had been approved, the finance manager told him that his payments would be $446.75 monthly for 60 months. This was memorialized by the RISC #1 and was signed by the Plaintiff and Global.   **Exhibit 3.**

25.    Global intentionally concealed from the Plaintiff that his car purchase and loan request had been approved by lenders on terms lower that what was presented to him by Global as "the best loan that we be found."

26.     Paragraph 2(c) on page 3 of the RISC #1 indicates that Plaintiff is providing Global a security interest in the vehicle and the RISC #1 requires that the payments shall be made to the "Creditor-Seller," which is Global. ¶3(b) defines "default" in part as, "You pay any payment (plus any late charges) more than 10 days late or not at all."

27.     At the time Plaintiff was presented with the paperwork to sign, he had been at the dealership for three or more hours and did not review the information carefully.   He trusted Global's employees to tell him what he needed to know regarding the documents he signed, he noted the monthly payment on the RISC #1 was what he had agreed to and was told those terms were the best Global could get for him, and did not review the documents much further and signed them.

28.     Global presented Plaintiff with thirty day temporary tags to drive the vehicle until title could be transferred. Global also required Plaintiff to obtain his own insurance for the vehicle and provide proof of it, which he did.

29.     After signing all the paperwork and providing the down payment and proof of insurance, Plaintiff shook hands with Bola and Alex, who congratulated him on his purchase and drove away in what he thought was his new car.

30.     Global submitted the Plaintiff's application for financing to one or more lenders in an effort to sell and assign the RISC #1.

31.     After the purchase and delivery of the vehicle to Plaintiff he discovered during a Maryland state safety inspection that his vehicle was not in the condition as described to him but in fact had been in an accident and repainted.   It still had a cracked taillight that had not been repaired, information he told a Global manager about on two occasions after he discovered it. 32.

After purchase Plaintiff received a second batch of backdated purchase documents to sign

9

which Danny Price, the finance manager for Global, explained were identical to the first batch he had signed, but were necessary to finalize the deal since Global had put the wrong vehicle identification number on the original purchase documents. See Buyer's Order #2 , RISC #2,   a loan application, and an application for title to the Virginia DMV, which were part of the second batch of documents Global sent Plaintiff to sign. **Exhibits 4, 5 , 6, and 7.**   (These documents have the same VIN as the original purchase documents).

33.     On or about April 30, 2011 Plaintiff had a conversation with the finance manager, Danny Price, regarding the new purchase documents Global wanted him to sign.   Mr. Price told Plaintiff that the real reason Global needed the second batch of documents signed was that his loan had not gone through and that if he did not sign the second batch of documents that the deal was cancelled and he had to bring the vehicle back.   When Plaintiff informed him that he did not intend to sign the second batch of documents Mr. Price told him the deal was cancelled and to return the vehicle on Monday, May 2, 2011.

34.     A review of RISC #1 (Ex. 3) and RISC #2 (Ex. 4) reveal that in RISC #2 Global increased the "Cash Price (incl. of sales tax)" even though the finance manager had told Plaintiff that the contracts were the same except for the Vehicle Identification Number.

35.     The sales tax charged by Global in both RISCs   (Ex. 3 & 4) are in an amount that is higher than the 6% permitted by Maryland law.

36.     Since Global had advised him that the sale was being cancelled, Plaintiff began the process of stopping payment on his $1,000.00 check and even called the alleged assignee of the RISC, Wells Fargo Dealer Services, which informed him that it had no record of a vehicle loan in his name.

37.     On Sunday, May 1, 2011 Plaintiff returned a call from Alex about the $1,000.00

10

down payment, who advised him that the finance manager, Danny Price, had said the deal had been cancelled and that he could bring the vehicle back on Monday, to which the Plaintiff agreed.

38.   On Monday, May 2, 2011, as requested by Global, Plaintiff and a friend returned the vehicle, but when he demanded his down payment back, he was informed by Alex that Global did not intend to cancel the deal or return his down payment, and that since he had not brought in the $1,000.00 down payment in cash it was repossessing the vehicle ("the taking"), that he did not care what Wells Fargo said about the loan because "Global is the bank," and to leave the vehicle on the lot because "you're wasting your time and mine."

39.   The $5,000.00 down payment was due on April 23, 2011, thus, according to ¶3(b) of the RISC #1 (Ex. 3) Plaintiff had ten days or until May 3, 2011 to pay the $5,000.00 before he was in default.

40.   Global repossessed the vehicle on May 2, 2011.

41.   Plaintiff was not in default when the vehicle was repossessed by Global.

42.   Since the taking of the automobile, Plaintiff has suffered damages for the loss of his down payment, cost of insurance, lost wages, cost of substitute transportation, aggravation, humiliation, and inconvenience.

43.   Based on information and belief, inducing customers to purchase its vehicles via fraudulent representations about the vehicles it is selling is a common business practice of Global. In fact, after the repossession of the Plaintiff's vehicle, on June 25, 2011 it was sold to Brandon Boey ("Mr. Boey"), and, not only was its prior repossession not disclosed to Mr. Boey or the Virginia Department Of Motor Vehicles as required by DMV regulations and Virginia law [Va. Code §59.1-200(7)], but Global, via its manager "Alex," fraudulently described the prior history of the vehicle to Mr. Boey as never having being an accident as proven by the "clean" Car Fax he

11

presented for the vehicle. This misrepresentation was made despite Global previously having been

told about the accident damage and repainting by the plaintiff and Global's knowledge that the

vehicle has sustained accident damage.

44.     Global never did the paperwork necessary to put title to the vehicle into Plaintiff's

name and never provided any notice of disposition of the vehicle to the Plaintiff after it

repossessed it and before it was sold to Mr. Boey.

45.     Plaintiff intends to purchase other vehicles in the future and if he needs financing

intends to seek financing for future purchases from the Crescent Bank, CPS and Chase Finance,

among others, if he needs a loan.


## COUNT ONE: VIOLATION OF THE EQUAL CREDIT OPPORTUNITY ACT

46.     The Defendants are "creditors" under the ECOA (15 USC § 1691 (a)) . The failure

of the Defendants to provide to Plaintiff notice of the approval of any credit application made to it

by Plaintiff, and due to their failure to provide any written or other statement of reasons for the

denial of credit, they violated the ECOA. 15 U.S.C. §1691(d) (1) and Reg. B, 12 C.F.R.

§202.9(a)(1)(i) (notice of approval required); and 15 U.S.C §1691(d) (2) (b) (notice of adverse

action required).

47.     As a result of the above alleged ECOA violations, Plaintiff has suffered substantial

actual damages in the loss of his right to learn that the loan had been approved on terms lower than

those provided him by Global, and then suffered actual damages in the loss of his right to

determine the basis for the other credit denials, his loss of the credit itself, plus suffered frustration,

anger, humiliation, fear, embarrassment, and other emotional and mental anguish.


48.     As a result of the above alleged ECOA violations, Defendants are liable to

12

Plaintiff for his actual damages pursuant to 15 U.S.C. §1691e (a), for punitive damages of $10,000.00 against each Defendant pursuant to 15 U.S.C. § 1691e (b), and for attorney's fees and costs pursuant to 15 U.S.C. § 1691e (d).

49.     Plaintiff is entitled to equitable relief against the Defendants since he intends to do business with them in the future, and thus asks the Court enter an Order requiring that in the future these Defendants abide by the ECOA and deliver compliant notices to customer loans they approve or on which they take adverse action. 15 U.S.C. §1691e ( c).

## COUNT TWO: VIOLATION OF FAIR CREDIT REPORTING ACT

50.     Plaintiff reiterates and incorporates paragraphs 1 through 49 above as if fully set out herein.

51.     The failure of the Defendants to send any adverse action notice to Plaintiff on each credit denial decision willfully violated the Fair Credit Reporting Act, 15 U.S.C. §1681m.

52.     In the alternative to the allegation that no notices were sent to Plaintiff, he alleges that the notices sent do not comply with the Fair Credit Reporting Act, 15 U.S.C. §1681m.

53.     In addition, if the credit decision was based on information other than information obtained from a credit reporting agency, Defendants willfully violated the FCRA by failing to provide the notice required by 1681m(b).

54.     In the alternative of a willful violation, the Defendants' violations were negligent.

55.     As a result of the above alleged FCRA violations, Plaintiff has suffered substantial actual damages in the loss of his rights to determine the basis for credit denial, his loss of the credit itself, frustration, anger, humiliation, fear, embarrassment and other emotional and mental anguish.

56.     As a result of these FCRA violations, Defendants are individually liable to Plaintiff for statutory damages from $100.00 to $1,000.00 pursuant to 15 U.S.C. §1681n(a)(1)(A), or jointly

and severally liable for actual damages pursuant to 15 U.S.C. §1681n and §1681o if the

amount of actual damages is greater than the statutory amount; Defendants are also individually

liable for punitive damages pursuant to 15 U.S.C. §1681n(a)(2), and for attorneys fees and costs

pursuant to 1681n and 1681o.

57.     Plaintiff is entitled to equitable relief against the Defendants requiring delivery of

compliant notices in all future instances.

## COUNT THREE: VIOLATION OF THE VIRGINIA CONSUMER PROTECTION ACT
(Against Global Only)

58.     Plaintiff reiterates and incorporates paragraphs 1 through 57 above as if fully set out

herein.

59.     Global violated the prohibition under of Va. Code § 59.1-200 (14) of using any

deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer

transaction by each, or by any one or a combination of the following actions:

> a. By stating that financing was approved when it had not been, (this violation is
> pled in the alternative to the allegations that the contract was final);
>
> b. by misrepresenting that the RISC contained terms of the loan that
> were the best it could find for the plaintiff when it had received
> approval for the vehicle loan on terms lower than those n the RISC;
> by misrepresenting the accident and painting history of the vehicle;
> by misrepresenting that the second batch of documents   were
> identical to the first; by misrepresenting the reason for the need for
> the second batch of documents; by misrepresenting that the second
> RISC was identical to the first except for vehicle identification
> numbers; by charging sales tax in an amount higher than the 6%
> required by Maryland law; by deceitfully indicating that the deal was
> cancelled so that Plaintiff would return the vehicle himself and
> Global would not have to pay for the vehicle to be towed; and then
> when Plaintiff returned the vehicle, indicating that the deal was not
> cancelled but that Global was repossessing the vehicle and
> confiscating his down payment;

14

c. by deceptively utilizing a Buyer's Order that violates Virginia law since it did not notify Plaintiff of his rights to cancel the sale and get his full down payment back if the loan was not approved by a third party assignee and that failure to return his down payment may be a violation of the VCPA;.

d. by utilizing a business practice of falsely promising Plaintiff it would make him the owner of the vehicle and that for a fee it would obtain his new title and tags for him when Global uses this purported "service" as a means to hide the fact that it is not transferring the old title to the consumer at the time of sale.

(Collectively, the "misrepresentations").

60.     Global committed the "misrepresentations" deliberately and willfully.

61.     As a result of the "misrepresentations" Plaintiff has suffered substantial actual damages including the cost of substitute transportation, aggravation, humiliation, and distress. Plaintiff has also suffered other substantial actual damages including, by example only and without limitation, the loss of the value of the vehicle he purchased from Global, the loss of use of this vehicle, the cost of substitute transportation, inconvenience, aggravation, humiliation, and other incidental and consequential damages which were reasonably foreseeable by Global.

62.     The Plaintiff is entitled to the greater of his actual and treble damages and $1,000.00 and his costs and attorneys fees pursuant to Virginia Code § 59.1-204.

### COUNT FOUR:   FRAUD
(Against Global Only)

63.     Plaintiff reiterates and incorporates paragraphs 1 through 61 above as if fully set out herein.

64.     Global made the "misrepresentations"(defined above) so that Plaintiff would sign the Buyer's Order and RISC and be obligated to pay this amount in order to receive the vehicle.

65.     At the time of sale Global intentionally misrepresented that it would make Plaintiff

15

the owner of the vehicle when it did not have present intent to perform under the Buyer's Order and the RISC nor did it have the present intent to put title in Plaintiff's name if it was not able to assign the RISC, but made these promises in order to obtain Plaintiff's signature on the sales and transaction documents.

66.     Based upon plaintiff's counsel's experience it is believed that Global uses such misrepresentations as alleged in this case and deceitful yo-yo sales as its standard business practice.

67.     Plaintiff relied on Global's representation about becoming the owner of the vehicle by signing the Buyer's Order and the RISC, becoming obligated under them, and he considered himself the owner of the car until Global cancelled the Sale and effectively repossessed the vehicle.

68.     Global made the "misrepresentations" so that on the one hand Plaintiff would sign the Buyer's Order and Credit Contract and become obligated to buy the vehicle and be obligated to those payments, but on the other hand, by not processing the title documents with DMV until it was able to sell the loan, permit it to repossess the vehicle if it decided not to go through with the sale at a later date if no buyer for the loan could be found, or if the third party assignee's off for buying the loan did not provide enough profit.

69.     As the agent for Plaintiff and as well for the DMV, upon issuing the temporary tags and registration Global was required to perform these DMV services immediately and had a fiduciary duty to perform these services; however it had no present intention of performing these services if the assignment of the RISC did not go through.

70.     Global's scheme of obtaining a fee to perform the Department of Motor Vehicle services is actually a means to hide the fact that it does not transfer title to consumers at the time of sale; this purported "service" is created solely for its benefit to hide its conduct, to allow it to demand a larger down payment or payment after the sale, and if not complied with, then demand or

16

even seize possession of vehicles after a sale, and to keep that sale from showing up in the official chain of title.

71.     The sale to the Plaintiff is not recorded in the vehicle's chain of title, even though it is believed the title was reassigned to Plaintiff via a separate Reassignment of Title form that would have been filed with Maryland had Global not cancelled the sale. The failure to record the sale to Plaintiff by filing the Reassignment of Title is called "skipping title", which obscures an owner of a vehicle, thereby making knowledge of his existence, the repossession difficult, and makes the buyer's ability to confirm the odometer certifications as accurate, virtually impossible, or any buyer's ability to discover problems le prior accident damage via contact with a prior owner.

72.     Plaintiff relied on these misrepresentations by signing the RISC #1 and Buyer's Order and getting his own insurance on the vehicle.

73.     Plaintiff was harmed by Global's misrepresentation because he never received title to the vehicle and had his vehicle repossessed.

74.     In addition, as a result of the Defendant's multiple acts of fraud and/or misrepresentation, he has suffered substantial actual damages from the confiscation of his down payment, the cost of substitute transportation, plus aggravation, humiliation, and distress.   The Plaintiff has also suffered other substantial actual damages, including, by example only and without limitation, the loss of the value of the vehicle he purchased from Global, inconvenience, aggravation, humiliation, and other incidental and consequential damages which were reasonably foreseeable by the Defendant.

75.     Defendant knew that all of the misrepresentations were false when it made them. It committed the fraud willfully and with deliberate intent.   It did so with actual and legal malice to the Plaintiff and without regard to his rights and interests.   Accordingly, the Defendants are also

17

liable to the Plaintiff for punitive damages.

## COUNT FIVE: BREACH OF CONTRACT
### (Against Global Only)

76.    Plaintiff reiterates and incorporates paragraphs 1 through 74 above as if fully set out herein.

77.    By accomplishing the taking and upon its refusal to honor the terms of the Buyer's Order and the RISC #1, Global breached its contract with Plaintiff to sell him the vehicle and to finance same (the "Breach").

78.    As result of the Breach, Plaintiff has suffered substantial actual damages in the value of the automobile, its loss of use, costs of cover, and other benefits of the ownership of the automobile.

## COUNT SIX: VIOLATION OF ARTICLE 9 OF UNIFORM COMMERCIAL CODE
### (Against Global Only)

79.    Plaintiff reiterates and incorporates paragraphs 1 through 78 above as if fully set out herein.

80.    After the Sale was transacted, the RISC #1 and Global were governed by Article 9 of the Uniform Commercial Code.

81.    Upon the taking, Global failed to comply with the default, notice and disposition requirements of Article 9 of the U.C.C. by taking possession of the automobile though Plaintiff was not in default and failing to provide notice of the disposition of the vehicle once it was repossessed. Virginia Code §§8.9A-609 (a)(1) and 611(b)- 614.

82.    As a result of the above alleged failures of Global to comply with Article 9 of the U.C.C., it is liable to Plaintiff for the greater of his actual damages and liquidated damages pursuant

18

to Virginia Code §8.9A-625 in the amount of the total finance charge and 10% of the principal as noted in the RISC.

WHEREFORE Plaintiff prays for judgment against the Defendants, jointly, severally, and individually for their actual, liquidated, punitive and statutory damages, for equitable relief; for reasonable attorney's fees and pre-judgment and post-judgment interest; for the costs of litigation; and for such other and further relief as the Court deems just and appropriate.

**TRIAL BY JURY IS DEMANDED**.

ZACHARY ALLEN MARTIN,

By _____
Counsel

John Cole Gayle, Jr.
VSB No. 18833
The Consumer Law Group. P.C.
5905 West Broad St., Suite 303
Richmond, Virginia 23230
804/282-7900
804/673-0316 Fax
jgayle@theconsumerlawgroup.com
Counsel for Plaintiff

19